## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARCUS A. T.,[1]                            )
                                            )
     Plaintiff,                       )
                                            )
vs.                                         )   Case No. 3:21-cv-00273-DWD
                                            )
COMMISSIONER OF SOCIAL                      )
SECURITY,                                   )
                                            )
     Defendant.                       )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the final agency decision, denying Plaintiff's applications for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI"), of Defendant. For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant.

## Procedural History

On June 11, 2018, Plaintiff filed an application for DIBs. (Doc. 13-2, pg. 12). Plaintiff also prospectively filed an application for SSI. (Doc. 13-2, pg. 12). In each application, Plaintiff alleged a disability onset date of November 20, 2015. (Doc. 13-2, pg. 12). Plaintiff's claims were initially denied in January 2019 and then again on reconsideration in April 2019. (Doc. 13-4, pgs. 6, 11). Thereafter, on March 16 and November 13, 2020, Plaintiff's claims were the subject of an initial evidentiary hearing and a supplemental

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

evidentiary hearing, respectively. (Doc. 13-2, pgs. 12, 17). In a decision dated December 9, 2020, an Administrative Law Judge ("ALJ") found Plaintiff was not disabled, resulting in a denial of his applications for DIBs and SSI by Defendant. (Doc. 13-2, pg. 25). On January 6, 2021, the Appeals Council denied Plaintiff's request for review. (Doc. 13-2, pg. 2). Therefore, the ALJ's decision is final for purposes of the Court's review. Plaintiff exhausted his administrative remedies and timely filed a Complaint (Doc. 1).

## The Evidentiary Record

Plaintiff was born June 1, 1977, and was 38 years old on the onset date of disability. (Doc. 13-2, pgs. 59-60). Plaintiff's highest level of education is a GED. (Doc. 13-2, pg. 60). The alleged disability stems, in part, from palmoplantar pustular psoriasis ("psoriasis"), chronic obstructive pulmonary disease ("COPD"), and lower back pain.

### A. Treatment

In late-October 2015, Plaintiff obtained emergency care, complaining of a rash. (Doc. 13-7, pg. 26). Plaintiff's condition was summarized as "[d]iffuse erythema itching[] and skin sloughing of the palms of the hands and soles of the feet." (Doc. 13-7, pg. 26). Plaintiff reported an aching and burning sensation from the peeling of his skin, which was noted in the report. (Doc. 13-7, pgs. 26-27). Plaintiff's hands and feet had an inflammatory and fungal type pattern, but no lesions or open wounds. (Doc. 13-7, pg. 27).

Plaintiff again sought emergency care, related to a "rash," in mid-November 2015. (Doc. 13-7, pg. 42). Plaintiff had slight swelling of the hands and feet. (Doc. 13-7, pg. 43). Plaintiff presented with "erythema and cracking skin" on the soles of his feet with "plaques and confluent erythema," as well as "diffuse erythema of the hands" with

erythematous plaques and scaling of the skin." (Doc. 13-7, pg. 43). The treating physician was "not certain of the etiology" of the rash. (Doc. 13-7, pg. 44).

In early-December 2015, Plaintiff twice sought emergency care and was hospitalized for five days. (Doc. 13-7, pgs. 103-11). Plaintiff had severe weeping wounds on his feet. (Doc. 13-7, pg. 103). Plaintiff also had cracked, bleeding, weeping, and sloughing skin, together with redness and swelling, on his feet. (Doc. 13-7, pg. 103). Plaintiff could not stand due to "severe pain." (Doc. 13-7, pg. 105). His diffuse rash, initially thought to be secondary to an allergy, was found likely related to an underlying disease. (Doc. 13-7, pg. 103). Plaintiff's skin was "much improved" at discharge. (Doc. 13-7, pg. 104). He was prescribed Tramadol and Prednisone. (Doc. 13-7, pg. 104).

In early-January 2016, Plaintiff presented for emergency care, reporting a "full body rash." (Doc. 13-7, pg. 71). The rash started on his feet and spread to his whole body. (Doc. 13-7, pg. 71). It was a "lichen like rash to feet and hands." (Doc. 13-7, pg. 76). Plaintiff's feet had erythematous and serious drainage, while his hands were excessively dry with no drainage. (Doc. 13-7, pg. 76). Plaintiff indicated that Prednisone previously improved the rash. (Doc. 13-7, pg. 71). A subsequent consultation with a dermatologist resulted in a diagnosis that Plaintiff had allergic contact dermatitis. (Doc. 13-7, pg. 84).

In mid-October 2016, Plaintiff sought emergency care due to chronic back pain. (Doc. 13-7, pg. 137). Plaintiff had spinal tenderness but no swelling. (Doc. 13-7, pg. 139).

In late-November 2016, Plaintiff saw Dr. Leyland Thomas, who, at the time, was Plaintiff's primary care physician. (Doc. 13-7, pg. 172). Plaintiff had low back pain with radiation to his right knee. (Doc. 13-7, pg. 172). Dr. Thomas ordered x-rays of Plaintiff's

3

lumbosacral spine and hip. (Doc. 13-7, pg. 175). An examination also revealed "[c]racking of skin of palms and soles" with "[n]o acute swelling/erythema." (Doc. 13-7, pg. 174). These same findings were made in mid to late-January 2017, at which time Plaintiff also presented for emergency care due to low back pain. (Doc. 13-7, pgs. 172, 241). The low back pain was "moderate" and Plaintiff "appear[ed] distressed." (Doc. 13-7, pg. 242). In late-February 2017, Plaintiff continued to complain of low back pain but, as of mid-March 2017, he reported that his low back pain was much improved. (Doc. 13-7, pgs. 166, 170). Dr. Thomas stopped the prescribed mediation for low back pain. (Doc. 13-7, pg. 166).

In mid-April 2017, Plaintiff received emergency care for "psoriasis exacerbation." (Doc. 13-7, pg. 232). Plaintiff indicated his feet itched and were swollen. (Doc. 13-7, pg. 233). Multiple scaly lesions, as well as open blisters, were observed on his right foot. (Doc. 13-7, pg. 234). There was also scaly skin, without open areas, noted on his foot. (Doc. 13-7, pg. 234). Plaintiff had a "[p]soriasis outbreak" on his feet that was described as "[n]ot very painful." (Doc. 13-7, pg. 237). Plaintiff also had fluid drainage and blistering on his right foot. (Doc. 13-7, pg. 237). Dr. John Lindsay, a podiatrist, observed Plaintiff and recommended that he begin steroid therapy. (Doc. 13-7, pg. 227).

In early-May 2017, Plaintiff sought emergency care for "foot pain" due to psoriasis. (Doc. 13-7, pg. 222). Plaintiff's skin was positive for a rash but was warm and dry. (Doc. 13-7, pgs. 224-25). In mid-May, Plaintiff was observed to have erythematous with cracked skin on the soles of his feet and, to a lesser extent, on the palms of his hands. (Doc. 13-7, pg. 163). Also, around this time, Plaintiff had lumbosacral tenderness to palpation, so Dr. Thomas prescribed Hydrocodone for low back pain. (Doc. 13-7, pg. 163). In late-May

4

2017, Plaintiff's feet were painful, draining, swelling, and quite itchy. (Doc. 13-7, pg. 217).

In late-July 2017, Plaintiff was again evaluated by Dr. Lindsay, a podiatrist. (Doc. 13-7, pg. 71). Dr. Lindsay observed that Plaintiff's skin had "some areas of slough and [was] somewhat erythematous" with serious drainage but no cellulitis. (Doc. 13-7, pg. 202). Plaintiff's protective threshold sensation in his lower extremities was intact and, despite pain with palpitation, he had full muscle strength in his feet. (Doc. 13-7, pg. 202).

In mid-August 2017, Dr. Thomas observed that Plaintiff had erythematous with cracked skin on the soles of his feet and, to a lesser extent, on the palms of his hands. (Doc. 13-7, pg. 160). Also around this time, Plaintiff was observed by a physician's assistant to have skin that was clear "only because he [wa]s on the Prednisone." (Doc. 13-7, pg. 456). If Plaintiff stopped taking Prednisone, then he would "likely experience a flare." (Doc. 13-7, pg. 456). On his right foot, Plaintiff had a few "erythematous, dry, flaky eruptions as well as a few small papules." (Doc. 13-7, pg. 456). Plaintiff began taking Betamethasone with a longer plan for Otezla. (Doc. 13-7, pg. 456). The next week, Plaintiff reported to Dr. Thomas that he saw a dermatologist, who also recommended Otezla. (Doc. 13-7, pg. 156). Plaintiff noted only steroids relieved his condition, but that the dermatologist was not in favor of steroids. (Doc. 13-7, pg. 156). Plaintiff was again observed to have erythematous with cracked skin on the soles of his feet and, to a lesser extent, on the palms of his hands. (Doc. 13-7, pg. 156).

Plaintiff was evaluated by a rheumatologist, Dr. Mahmoodur Rasheed, in September 2017. (Doc. 13-7, pg. 192). During that visit, Plaintiff reported symptoms of dry and itchy skin on his feet, which he believed got infected. (Doc. 13-7, pg. 192). Plaintiff

5

also described "a stabbing type of pain in his toes." (Doc. 13-7, pg. 192). Plaintiff had tenderness across his lower back. (Doc. 13-7, pg. 195). Plaintiff could stand and walk without any support. (Doc. 13-7, pg. 195). Plaintiff was observed to have dry palms and a rash. (Doc. 13-7, pg. 196). Plaintiff was also observed to have dry, thick, and cracked skin on the soles of his feet. (Doc. 13-7, pg. 196). Dr. Rasheed confirmed Plaintiff had psoriasis that caused pain in his feet. (Doc. 13-7, pg. 196).

Around early-January 2018, Plaintiff's appeal to use Otezla was denied. (Doc. 13-7, pg. 449). However, Plaintiff decided to attempt another prior authorization for Otezla. (Doc. 13-7, pg. 449). As of that time, Plaintiff, generally, was "feeling well and healthy." (Doc. 13-7, pg. 448). He had a few dry and flaky patches of skin on his palms, but his skin was otherwise "somewhat controlled." (Doc. 13-7, pg. 448). This was because Plaintiff was on steroids, which was not something he could continue to take. (Doc. 13-7, pg. 448).

In late-January 2018, Plaintiff saw his new primary care physician, Dr. Michael Klein. (Doc. 13-8, pg. 6). Plaintiff had no abnormalities, and his skin was warm and dry. (Doc. 13-8, pg. 6). However, in mid-April 2018, Plaintiff sought emergency care for right foot pain caused by a psoriasis flareup. (Doc. 13-7, pg. 275). The bottom of Plaintiff's foot was blistering. (Doc. 13-7, pg. 275). While Plaintiff "normally walks without difficulty," he was in a wheelchair on this date. (Doc. 13-7, pg. 275). Plaintiff was scheduled to see Dr. Lindsay the next day but could not wait due to the pain. (Doc. 13-7, pg. 275).

 The next day, Plaintiff informed Dr. Lindsay that the blistering on his foot began after he stopped taking Prednisone. (Doc. 13-7, pg. 273). Dr. Lindsay observed that Plaintiff had a "serious-filled" vesicle, with some associated erythematous scaling but no

malodor or purulence, on his right foot. (Doc. 13-7, pg. 274). Dr. Lindsay told Plaintiff that he needed a dermatologist to take care of his condition. (Doc. 13-7, pg. 274). Dr. Lindsay prescribed a 30-day course of Prednisone for Plaintiff. (Doc. 13-7, pg. 274).

In late-April 2018, Plaintiff sought emergency care for worsening foot pain, edema, and drainage. (Doc. 13-7, pg. 260). Plaintiff's right sole was denuded, and the area was moist and weeping. (Doc. 13-7, pg. 261). The right sole was also thickened and whitish with erythema and tenderness in his toes and foot. (Doc. 13-7, pg. 261). Plaintiff reported this flareup was different from past flareups, as the "cycle of blistering, skin cracking, and drainage" took 14 days to reach its present state. (Doc. 13-7, pg. 260). Plaintiff reported that steroids slowly relieve his foot pain and then provide relief for six to eight months. (Doc. 13-7, pg. 260). At a follow-up appointment three days later, Plaintiff said his "feet and hands [we]re better," despite having thick skin, with scaly lesions, and mild tenderness. (Doc. 13-7, pg. 259). Shortly thereafter, Plaintiff was observed to have "several erythematous, dry, flaky, lichenified plaques" on his hands and feet. (Doc. 13-7, pg. 444). Plaintiff also had several areas of peeling and small eruptions. (Doc. 13-7, pg. 444).

In early-June 2018, Plaintiff saw Dr. Klein and reported no new issues. (Doc. 13-8, pg. 21). However, around that same time, Plaintiff reported to a medical provider, by telephone, that he was experiencing a recurrence of blisters on the bottom of his left foot. (Doc. 13-7, pg. 441). That issue did not require a medical visit because, despite continued redness and itchiness, the blisters burst and mostly went away. (Doc. 13-7, pg. 441).

In late-July 2018, Dr. Klein noted that Plaintiff's skin was warm and dry, but that he had multiple scaley red lesions on the bottoms of his feet. (Doc. 13-8, pgs. 26-27). A

few days later, in early-August 2018, Plaintiff complained to Dr. Lindsay of blister formation and drainage on his right foot. (Doc. 13-8, pg. 77). Plaintiff indicated he saw a dermatologist who prescribed him Otezla, which he was supposed to receive within a week. (Doc. 13-8, pg. 77). Dr. Lindsay noted moistness and erythema, with excoriation but no purulence or malodor, on Plaintiff's right foot. (Doc. 13-8, pg. 78).

In a function reported from September 2018, Plaintiff indicated his daily activities include caring for his child. (Doc. 13-6, pg. 17). Plaintiff also prepares simple meals like sandwiches and frozen food. (Doc. 13-6, pg. 17). In terms of household tasks, Plaintiff cleans, mows the grass, and does laundry. (Doc. 13-6, pg. 17). However, during flareups of his psoriasis, Plaintiff indicated it was not possible to complete those tasks due to the pain in his hands and feet. (Doc. 13-6, pgs. 17-18). Plaintiff also reported that flareups limit his social activities and hobbies, such as fishing and camping. (Doc. 13-6, pg. 17).

In mid-November 2018, Plaintiff reported that he was taking Otezla. (Doc. 13-8, pg. 30). In December 2018, Dr. Raymond Leung conducted an internal medicine consultive evaluation of Plaintiff. (Doc. 13-7, pg. 489). Dr. Leung noted the palms of Plaintiff's hands and the soles of his feet "were just slightly dry." (Doc. 13-7, pg. 493). The bottom of his right foot was slightly red and flaky. (Doc. 13-7, pg. 493). Plaintiff was also noted to have a "minimal limp." (Doc. 13-7, pg. 494). Nonetheless, Plaintiff could walk 50 feet without assistance, tandem walk and hop, heel walk, toe walk, and squat. (Doc. 13-7, pg. 494). Plaintiff could oppose his thumbs to fingers on each hand. (Doc. 13-7, pg. 494).

In late-April 2019, Plaintiff saw Dr. Klein and reported he was feeling fine. (Doc. 13-8, pg. 52). Dr. Klein noted a large area of erythema, 6 by 10 centimeters, on the sole of

Plaintiff's left foot. (Doc. 13-8, pg. 54). Plaintiff saw Dr. Klein in mid-September 2019 and was again feeling fine. (Doc. 13-8, pg. 61). There are no treatment records after this date.

### B. Administrative Hearings

At the initial hearing on March 16, 2020, Plaintiff described his psoriasis as "extremely bad," causing his skin to crack, blister, turn white, and fall off his body. (Doc. 13-2, pg. 62). Plaintiff stated these symptoms, which come and go, began in 2015. (Doc. 13-2, pg. 62). Plaintiff's flareups, which mostly affected the palms of his hands and the soles of his feet, usually lasted for several weeks or maybe a month. (Doc. 13-2, pgs. 62-63). When a flareup occurs, Plaintiff testified that he would elevate his feet and recline. (Doc. 13-2, pg. 64). Plaintiff stated he has difficulty sleeping during a flareup, sometimes staying awake for twenty-two or twenty-three hours a day. (Doc. 13-2, pgs. 64-66). If his feet were affected, Plaintiff indicated that he was unable to stand. (Doc. 13-2, pg. 63). Likewise, if his hands were affected, Plaintiff stated he was unable to grip and hold. (Doc. 13-2, pg. 63). Plaintiff testified that he last experienced a flareup approximately two months before the initial hearing, *i.e.*, in January 2020. (Doc. 13-2, pg. 63). The flareup lasted three weeks. (Doc. 13-2, pgs. 63-64). During that entire flareup, Plaintiff stated he was unable to stand. (Doc. 13-2, pg. 64). For 2 of the days in the three-week period, Plaintiff testified that he was unable to grip and hold. (Doc. 13-2, pg. 64).

Plaintiff stated he experienced "weeping wounds" or "open sores" for the entirety of a flareup, even when taking medication. (Doc. 13-2, pg. 65). Plaintiff elaborated that, at the end of a flare, the skin would start to heal and, though it was painful to walk, he was "good" once the swelling went down. (Doc. 13-2, pg. 65). If the swelling does not go

down, then Plaintiff stated his skin would "just keep ripping." (Doc. 13-2, pg. 66). Plaintiff said he took Otezla, which provided relief to his psoriasis. (Doc. 13-2, pg. 66). However, despite Otezla, Plaintiff testified that he still experienced flareups. (Doc. 13-2, pgs. 62, 66). Plaintiff described the pain during a flareup as "excruciating" and a 10 out of 10 on a pain scale. (Doc. 13-2, pgs. 65-66). Plaintiff also had back pain, described as a 5 out of 10 on a pain scale, "all the time." (Doc. 13-2, pgs. 67-68). Prolonged bending, standing, and sitting made the pain worse. (Doc. 13-2, pg. 69). But Plaintiff reported, generally, he could stand for 15 to 20 minutes at a time and sit for 60 to 90 minutes at a time. (Doc. 13-2, pg. 69).

After Plaintiff's testimony, the ALJ received testimony from Brenda Young, who is a vocational expert. (Doc. 13-2, pg. 73). Considering certain assumptions posed by the ALJ, Young testified that an individual with Plaintiff's age, education, and no past relevant work experience could perform jobs in the national economy, namely, the jobs of order clerk, ticket checker, and optical goods assembler at the sedentary level. (Doc. 13-2, pgs. 73-74). However, Young stated that work would be eliminated if the individual's ability to push or pull was less than occasional, and the use of his or her hands for handling, fingering, and feeling was no more than occasional. (Doc. 13-2, pg. 75). In terms of absenteeism, Young opined that an employer in sedentary, unskilled work would, generally, tolerate no more than one absence a month. (Doc. 13-2, pg. 75).

On July 8, 2020, which was between the initial hearing and the supplemental hearing, Plaintiff's primary care physician, Dr. Klein, submitted a "physical residual functional capacity questionnaire" ("physical RFC questionnaire") (Doc. 13-8, pg. 107). Dr. Klein indicated Plaintiff had psoriasis and "low back pain," the latter of which

resulted in aches and tenderness but no radiation to legs. (Doc. 13-8, pg. 107). Plaintiff's prognosis was "poor." (Doc. 13-8, pg. 107). Dr. Klein indicated that Plaintiff's impairments lasted or could be expected to last at least 12 months. (Doc. 13-8, pg. 108). When asked how often during a typical workday Plaintiff would experience pain or other symptoms that were severe enough to interfere with the attention and concentration necessary for even simple work tasks, Dr. Klein checked "frequently," which the physical RFC questionnaire defined as 34 to 66% of an eight-hour workday. (Doc. 13-8, pg. 108).

Further, Dr. Klein indicated that Plaintiff was "[c]apable of low stress jobs." (Doc. 13-8, pg. 109). Dr. Klein then indicated, by circling an answer from a range of options, Plaintiff could sit for 2 hours before needing to get up, and stand for 15 minutes before needing to sit down or walk around. (Doc. 13-8, pg. 109). In the same way, Dr. Klein indicated that Plaintiff could sit a total of "[a]t least 6 hours" and stand "[l]ess than 2 hours" in an 8-hour workday with normal breaks. (Doc. 13-8, pg. 109). Dr. Klein answered that Plaintiff could walk "one" city block without rest or severe pain. (Doc. 13-8, pg. 109). However, Dr. Klein also believed, every two hours in an 8-hour workday, Plaintiff would need a 10-minute period of walking. (Doc. 13-8, pgs. 109-10). Dr. Klein also indicated Plaintiff would need unscheduled, 10-minute breaks, every 2-3 hours. (Doc. 13-8, pg. 110).

Dr. Klein, by selecting a choice from a range of options, answered Plaintiff could "[o]ccasionally" lift and carry "[l]ess than 10 pounds." (Doc. 13-8, pg. 110). Dr. Klein believed Plaintiff could only "[r]arely" lift and carry "10 pounds." (Doc. 13-8, pg. 110). Finally, Dr. Klein indicated Plaintiff's impairments would likely produce "good days"

and "bad days," necessitating, on average, "[a]bout three (3) days per month" where he would be absent from work due to his impairments or treatment. (Doc. 13-8, pg. 110).

Defendant's medical expert, Dr. Allan D. Duby, was a non-examining physician who testified at the supplemental hearing on November 13, 2020. (Doc. 13-2, pg. 36). He reviewed the record in this case and was prepared to issue a summation. (Doc. 13-2, pg. 39). Dr. Duby noted Plaintiff's psoriasis was a main problem. When active on his palms and the soles of his feet, Plaintiff's psoriasis was a severe impairment. (Doc. 13-2, pg. 40). Plaintiff's "main problem" was his feet, as the record for Plaintiff's hands was "very minimal." (Doc. 13-2, pg. 42). Dr. Duby noted Plaintiff's psoriasis could be less or "minimally active," at which time it had a lesser effect on his functioning. (Doc. 13-2, pgs. 40-41). Dr. Duby stated Plaintiff responded to "oral cortisone, prednisone and it help[ed] a lot." (Doc. 13-2, pg. 41). Dr. Duby also opined that Plaintiff's psoriasis impairment did not meet or medically equal any listings in the regulations. (Doc. 13-2, pg. 40).

When Plaintiff's condition was at its worst, Dr. Duby opined that he could not stand or walk for more than an hour a workday. (Doc. 13-2, pg. 41). Also, when the condition is at its worst, Dr. Duby believed Plaintiff "could probably sit for six hours" a workday. (Doc. 13-2, pg. 41). In reference to three of Plaintiff's emergency visits, Dr. Duby noted "there was some [psoriasis] activity…in his soles" that would lead to some functional limitations, "but it wouldn't preclude him from being able to sit, stand, walk in an eight hour day." (Doc. 13-2, pg. 42). Dr. Duby did not disagree that Plaintiff could frequently lift up to 10 pounds, and occasionally lift 11-20 pounds. (Doc. 13-2, pgs. 51-52).

Since Plaintiff's psoriasis "can be very severe at times and then at other times can be relatively quiescent," Dr. Duby said it is difficult to assess how long a claimant can stand at one time and in an 8-hour workday. (Doc. 13-2, pg. 52). However, Dr. Duby indicated the times can be averaged. (Doc. 13-2, pg. 52). Based on the record, Dr. Duby concluded that Plaintiff could stand for one hour at a time and for a total of four hours in a workday. (Doc. 13-2, pg. 52). Plaintiff could walk for one hour at a time and for a total of four hours in a workday. (Doc. 13-2, pg. 52). Dr. Duby would limit the combination of standing and walking in an 8-hour workday to five hours. (Doc. 13-2, pg. 52).

Dr. Duby stated Plaintiff's lower back pain was another main problem, even suggesting Plaintiff would not be able to sit, walk, and stand in an 8-hour workday with limitations. (Doc. 13-2, pgs. 41-42). However, Dr. Duby noted, while complaints of back pain were well documented in the record, there was no causal diagnosis and a minimal amount of investigation. (Doc. 13-2, pg. 39). As such, the record of the lower back problem was "quite limited." (Doc. 13-2, pg. 39). Similarly, with respect to Defendant's COPD, Dr. Duby noted there's no documentation that it affected his functioning. (Doc. 13-2, pg. 40). Based on the record, Dr. Duby disagreed with the physical RFC questionnaire of Dr. Klein, a family physician "not qualified to treat this condition." (Doc. 13-2, pg. 44).

## Applicable Legal Standards

To qualify for DIBs or SSI, a claimant must be disabled. A disability is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that, *inter alia*, has lasted or can be expected to last for a continuous period of not less than 12 months. 28 U.S.C. § 423(d)(1)(A). The

claimant bears the burden of producing medical evidence to support the claims of disability. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); *see also* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under disability unless he furnishes such medical and other evidence of the existence thereof."). While a claimant's statements of pain or other symptoms are considered, those statements alone are not conclusive evidence of a disability. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529.

To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. §§ 404.1520 (a)(1), (2), (4); 416.920(a)(1), (4). The ALJ asks the following questions: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) whether the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) whether, in view of the claimant's residual functional capacity ("RFC") and past relevant work, he or she can perform past relevant work; and (5) whether, in view of the claimant's RFC, age, education, and work experience, he or she can adjust to other work. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),(ii), (iv), (v); 416.920(a)(4)(i), (ii), (iv), (v). If

14

the claimant has an impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then he or she is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii),(v); 416.920(a)(4)(iii), (v). The claimant has the burden of proof at steps 1-4. *Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden shifts to the Commissioner of Social Security to demonstrate that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy." *See Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Relevant to this case, a claimant's impairments and related symptoms may cause physical and mental limitations that affect what may be done in a work setting. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC at issue in steps 4 and 5 assesses the most that a claimant can do in a work setting, notwithstanding those limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). In this way, an RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent work schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on all of the relevant medical and other evidence contained in the record. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ must identify the claimant's functional limitations and assess his or her work-related abilities on a function-by-function basis. *See Tenhove*, 97 F. Supp. 2d at 569; SSR 96-8p, 1996 WL 374184, *1, 3; *accord*

*Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004). The ALJ considers all impairments, including those that are not severe, and the claimant's ability to meet physical, mental, sensory, and other requirements of work. *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4). In terms of physical abilities, the ALJ assesses the nature and extent of any physical limitations, then determines the RFC for work activity on a regular and continuing basis. *See* 20 C.F.R. §§ 404.1545(b); 416.945(b). A limited ability to perform physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, or crouching may reduce the ability to do "other work" at step 5 of the sequential evaluation process. *See* 20 C.F.R. §§ 404.1545(b); 416.945(b); *see also* SSR 96-8p, 1996 WL 374184, *5-6. Other impairments affecting work abilities include, among other things, impairments of the skin or impairments stemming from various environmental restrictions. *See* 20 C.F.R. §§ 404.1545(d); 416.945(d).

After the identification of the claimant's functional limitations and the assessment of his or her work abilities on a function-by-function basis, the RFC may be expressed by exertional category, including "sedentary." *See Tenhove*, 97 F. Supp. 2d at 569; *accord Lechner*, 321 F. Supp. 2d at 1036; SSR 96-8p, 1996 WL 374184, *3. To do a full range of work in an exertional category, such as "sedentary," the individual must be able to perform substantially all of the functions required at that level. *See* SSR 96-8p, 1996 WL 374184, *5-6. Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a); 416.967(a). A sedentary job involves sitting but often has a certain amount of walking and standing necessary to its related duties. *See* 20 C.F.R. §§ 404.1567(a);

16

416.967(a). Jobs are sedentary if walking and standing are required occasionally, and the other sedentary criteria are satisfied. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a).

As part of an RFC assessment, the ALJ must consider and address medical source opinions. *See* SSR 96-8p, 1996 WL 374184, *7. If the RFC assessment conflicts with an opinion from a medical source, then the ALJ must explain why the opinion was not adopted. *See id.*; *accord Smith v. Colvin*, 9 F. Supp. 3d 875, 887 (E.D. Wisc. 2014). Medical opinions are considered pursuant to the following factors: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors supporting or contradicting the medical opinion, including evidence showing familiarity with other evidence in the claim or an understanding of disability policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(c); 416.920c(c). The most important factors to the persuasiveness of a medical opinion, however, are supportability and consistency.[2] *See* 20 C.F.R. §§ 404.1520c(a), (b)(2); 416.920c(a), (b)(2). As a matter of fact, an ALJ may, but is not required to, explain how it considered the other factors. *See* 20 C.F.R. §§ 404.1520c(c)(3)-(5); 416.920c(c)(3)-(5).

## The ALJ's Decision

The ALJ assessed Plaintiff's alleged disability under the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520 (a)(1), (2), (4). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged disability onset

---

[2]The more relevant the objective medical evidence and supporting explanations presented by a medical source are to *support* his or her medical opinions, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). The more *consistent* medical opinions are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).

date, November 20, 2015. (Doc. 13-2, pg. 14). At step two, the ALJ found Plaintiff suffered from severe impairments, *i.e.*, psoriasis, COPD (also diagnosed as emphysema), and degenerative joint disease of the midfoot. (Doc. 13-2, pg. 14). With respect to Plaintiff's back pain, the ALJ explained that, overall, the objective and other evidence did not illustrate the "minimal" or "very mild" abnormalities in his lumbar spine caused more than minimal functional limitations, such that lumbar degenerative disc disease was not a severe impairment. (Doc. 13-2, pgs. 14-15). The ALJ emphasized that he fully considered all severe and non-severe impairments when assessing Plaintiff's RFC. (Doc. 13-2, pg. 15).

At step 3, the ALJ found Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of the impairments listed in the regulations. (Doc. 13-2, pgs. 15-16). Before proceeding to step four, the ALJ assessed Plaintiff's RFC. The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's statements on the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent" with the evidence. (Doc. 13-2, pg. 17). The ALJ noted, on multiple occasions before mid-June 2018, when Plaintiff filed his applications for DIBs and SSI, Plaintiff sought emergency treatment for his conditions. (Doc. 13-2, pgs. 17, 22). However, after mid-June 2018, the ALJ noted Plaintiff received no emergency treatment for those conditions. (Doc. 13-2, pg. 22). By November 2018, the ALJ observed that Plaintiff received little treatment, including no inpatient treatment, for his conditions. (Doc. 13-2, pg. 22). The record reflected no treatment at all after September 2019. (Doc. 13-2, pg. 22).

With respect to Plaintiff's psoriasis, specifically, the ALJ stated the objective

examinations only rarely illustrated significant abnormalities of the skin on Plaintiff's hands and feet as of November 2018. (Doc. 13-2, pgs. 17, 21). However, even before that time, when Plaintiff experienced flareups, the ALJ concluded the evidence did not reasonably support Plaintiff's allegations that he was unable to stand or walk. (Doc. 13-2, pg. 17). Rather, the ALJ found Plaintiff could reasonably perform a reduced range of sedentary work. (Doc. 13-2, pg. 21). The ALJ reasoned that Plaintiff was hospitalized for inpatient treatment only once after the alleged disability onset date, and that he had not exhibited overt and significant deficits in gait or the ability to stand when presenting for emergency care. (Doc. 13-2, pgs. 21-22). With respect to Plaintiff's hands, the ALJ found Plaintiff's flareups were much less common, such that the record did not contain sufficient findings to support a conclusion that Plaintiff was unable to grasp or use his hands due to flareups. (Doc. 13-2, pg. 17). Plaintiff's activities in and before 2018, such as caring for his child, using a sledgehammer, and pushing a box that weighed over 300 pounds, were also noted as inconsistent with a disability finding. (Doc. 13-2, pg. 22).

As further support, the ALJ found Plaintiff's psoriasis responded well to Prednisone, despite it taking time to be effective and the fact it could not be used indefinitely. (Doc. 13-2, pg. 17). Similarly, Plaintiff experienced significant improvement in his psoriasis from taking Otezla. (Doc. 13-2, pg. 21). The ALJ noted, after August 2018, only one treatment notation reflected Plaintiff had significant abnormalities of the skin. (Doc. 13-2, pg. 21). There was no evidence, other that Plaintiff's testimony, he experienced a flareup two months before the initial hearing on March 16, 2020. (Doc. 13-2, pg. 17).

For these reasons, the ALJ concluded Plaintiff could perform sedentary work

under 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the exception of foot control operations. Plaintiff could not crawl or climb ramps, stairs, ladders, ropes, or scaffolds. (Doc. 13-2, pg. 16). Plaintiff could occasionally stoop, kneel, and crouch. (Doc. 13-2, pg. 16). He was to avoid exposure to extreme cold and heat, wetness, and humidity; concentrated exposure to irritants, such as fumes, odors, dust, gases, and poorly ventilated areas; exposure to extreme vibration; control of moving machinery; working at unprotected heights; and using hazardous machinery. (Doc. 13-2, pg. 16).

> In so concluding, the ALJ stated the opinion of Dr. Duby was persuasive because: [H]e provided strong support for his conclusions in the form of his rather extensive testimony, which included a summary of—and specific citations to—the medical evidence of record. Dr. Duby was also able to review the entirety of the medical record before he rendered his opinion…. [T]he undersigned finds that Dr. Duby's conclusions are also consistent with the remainder of the record as a whole.

(Doc. 13-2, pg. 18). Dr. Klein's physical RFC questionnaire was unpersuasive because:

> He rendered…[his] opinion on a largely checkbox form, and he provided only minimal narrative comments in support of his conclusions. These comments include[d] that the claimant experienced pustular psoriasis…. However, Dr. Klein entered no explanatory comments regarding the degree of psoriasis symptomatology he had observed, and he did not comment on the frequency or severity of any skin symptoms. In addition, the medical evidence as a whole, including Dr. Klein's own treatment notations, are not

consistent with these assessed limitations. Dr. Klein's objective examinations only sometimes reflect the presence of any skin abnormalities, and he has not noted the claimant to present with any significant deficits of gait or station…. Also, as is noted above in this decision, the record does not illustrate that Dr. Klein has seen the claimant for any treatment since September of 2019, or nearly 10 months before he completed the opinion form described above…. It therefore appears that Dr. Klein did not base his responses on any recent knowledge of the claimant's condition.

(Doc. 13-2, pg. 23).[3]

Following the lengthy RFC assessment, the ALJ found Plaintiff had no past relevant work at step 4. (Doc. 13-2, pg. 23). At step 5, the ALJ found, based on his age, education, work experience, and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy. (Doc. 13-2, pg. 24). In doing so, the ALJ noted that if Plaintiff had the RFC to perform the full range of sedentary work, then he would not be disabled. (Doc. 13-2, pg. 24). However, the ALJ recognized Plaintiff's ability to perform all or substantially all the requirements of that work was impeded by other limitations. (Doc. 13-2, pg. 24). Therefore, to determine the extent that those limitations eroded the

---

[3]The ALJ found the opinions of other non-examining doctors, Drs. Lenore Gonzalez and Ranga Reddy, were "not fully persuasive," as they were not privy to the entire medical record. (Doc. 13-2, pg. 22). The opinion of Dr. Steven Goldstein was also unpersuasive, as he did not provide adequate narrative support, citations, dates, or other support for his conclusions. (Doc. 13-2, pgs. 22-23). Now, Plaintiff agrees the ALJ "rightly determined" the opinions of Drs. Gonzalez and Reddy were "not fully persuasive." (Doc. 19, pg. 17). Plaintiff also agrees the opinion of Dr. Goldstein was "not persuasive." (Doc. 19, pg. 17).

unskilled sedentary occupational base, the ALJ queried a vocational expert about the jobs existing in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (Doc. 13-2, pg. 24). The vocational expert opined that, given those factors, the individual could perform the requirements of representative occupations, such as an order clerk (65,000 existing jobs), a ticket taker (700,000 existing jobs), and an optical goods assembler (200,000 existing jobs). (Doc. 13-2, pg. 24). As a result, the ALJ concluded Plaintiff could adjust to other work existing in significant numbers in the national economy, such that he was "not disabled." (Doc. 13-2, pg. 24-25).

For these reasons, the ALJ found Plaintiff was not disabled from November 20, 2015, to December 9, 2020, which was the date of its decision. (Doc. 13-2, pg. 25). As a result, Defendant denied Plaintiff's applications for DIBs and SSI. (Doc. 13-2, pg. 25).

## <u>Analysis</u>

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, ---F.4th---, 2022 WL 4126293, *3 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Finding of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). In this context, "substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, ---F.4th---, 2022 WL

4126293, *3. If reasonable minds could differ about whether a claimant is disabled and the ALJ's decision is supported by substantial evidence, then the Court will affirm the denial of claims. *See Jarnutowski*, ---F.4th---, 2022 WL 4126293, *3 (quoting *Elder*, 529 F.3d at 413). When assessing the evidence, the Court reviews the entire record, but does not reweigh the evidence, resolve conflicts, decide credibility questions, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ must build a logical bridge between the evidence and conclusions. *See Jarnutowski*, ---F.4th---, 2022 WL 4126293, *3 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The Court will not decline to engage in a critical review to act as a rubber stamp. *See Clifford*, 227 F.3d at 869.

Now, Plaintiff argues the ALJ failed to fully consider Dr. Duby's opinion and then acknowledge the consistencies between that opinion and Dr. Klein's physical RFC questionnaire. (Doc. 19, pgs. 1, 16). Plaintiff argues these failures resulted in an RFC that was not supported by substantial evidence or the applicable legal standards, and prevented the ALJ from finding Plaintiff disabled. (Doc. 19, pgs. 1, 16). In doing so, Plaintiff disputes the ALJ's findings relating to each doctor's opinion. (Doc. 19, pg. 1).

In relation to Dr. Duby, Plaintiff argues the ALJ "obscured" his opinion. (Doc. 19, pg. 19). That is, the ALJ found Plaintiff could sustain work activity, requiring standing and walking for no more than four hours in a workday or one hour at a time, without explaining how that indicated an average ability between Plaintiff's best and worst days. (Doc. 19, pg. 19). Further, Plaintiff argues Dr. Duby's opinion that he would be functionally limited during flareups, but not precluded from sitting, standing, and

23

walking during a workday, was "simply false." (Doc. 19, pg. 19). As support for these arguments, Plaintiff states Dr. Duby testified that his psoriasis was variable in nature and, at its worst, likely prevented him from standing or walking for more than one hour a workday. (Doc. 19, pgs. 19-20). Dr. Duby also indicated, at worst, Plaintiff could sit for six hours a day. (Doc. 19, pg. 20). As such, even in sedentary work, Plaintiff submits that Dr. Duby indicated Plaintiff could sit, stand, or walk for less than seven hours a workday, which is below what is required in competitive, full-time employment. (Doc. 19, pg. 20).

With respect to Dr. Klein, Plaintiff states the ALJ's findings "deliberately miss[ed] the point," as Dr. Klein described variable levels of impairment between Plaintiff's good days and bad days. (Doc. 19, pg. 18). If Dr. Klein's findings were construed to reflect a bad day, then Plaintiff submits that those findings "largely overlap" with Dr. Duby's findings. (Doc. 19, pg. 18). Further, Plaintiff argues it is difficult to understand why Dr. Klein was faulted for not having seen Plaintiff "for any treatment since September of 2019, or nearly 10 months before he completed the opinion form." (Docs. 13-2, pg. 23; 19, pg. 18). The ALJ found the opinion of Dr. Duby, a non-examining physician, was persuasive, and Dr. Duby, unlike Dr. Klein, did not have the benefit of past treatment or the ability to review his own records. (Doc. 19, pg. 18). Plaintiff suggests that the concerns noted by the ALJ could have been, at a minimum, clarified by Dr. Klein. (Doc. 19, pg. 18).

When properly construed, Plaintiff submits that the opinions of Drs. Duby and Klein present "agreeing elements." (Doc. 19, pg. 20). For example, Dr. Duby opined that Plaintiff's functional impairment would vary based on the severity of his psoriasis, while Dr. Klein acknowledged that Plaintiff would have good days and bad days. (Doc. 19, pgs.

20-21). Further, Dr. Duby opined that Plaintiff could sit for six hours in a workday but could not stand or walk for more than one hour in a workday, while Dr. Klein believed Plaintiff could sit for six hours in a workday but could only stand for under two hours in a workday. (Doc. 19, pg. 21). The only "question mark," in Plaintiff's view, was Dr. Duby's opinion on the frequency with which Plaintiff would experience severe and debilitating bouts of psoriasis. (Doc. 19, pg. 21). Even here, though, Plaintiff indicates the doctors' opinions could be reconciled to "suggest that Plaintiff may be dealing with flares [of psoriasis] an average of three days per month." (Doc. 19, pg. 21).

Here, the Court **FINDS** the ALJ properly considered the testimony of Dr. Duby and the physical RFC questionnaire of Dr. Klein. When assessing Plaintiff's RFC, the ALJ explained, in detail, why Dr. Duby's opinion was adopted as persuasive and why Dr. Klein's physical RFC questionnaire was not. *See* SSR 96-8p, 1996 WL 374184, *7; *Smith*, 9 F. Supp. 3d at 887. In doing so, the ALJ also demonstrated that Dr. Duby's opinion was supported by and consistent with the objective medical evidence, explanations of record, and other sources in the claim. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2); 416.920c(c)(1)-(2).

On the one hand, Dr. Duby testified, in person, at the supplemental hearing. Dr. Duby indicated that he reviewed the record in this case and, as evidence of that fact, provided detailed explanations and specific citations to support his conclusions. For example, Dr. Duby, based on his review of the record, identified and elaborated on Plaintiff's "main problems" or impairments. He also assessed the differences between the psoriasis of Plaintiff's hands and feet, which was the first main problem, and then the varying degrees to which that psoriasis was active and more or less a limitation of

Plaintiff's functions. Dr. Duby also opined on the response of the psoriasis to medication, namely, to "oral cortisone, prednisone." Further, Dr. Duby discussed Plaintiff's psoriasis activity at its worst and in the context of specific emergency visits, which are documented in the record. At its worst, Plaintiff could still sit for six hours in a workday. (Doc. 13-2, pg. 41) Further, at worst, that psoriasis would not preclude Plaintiff from sitting, standing, and walking in an 8-hour day. What is more, Dr. Duby, from a broader perspective, opined on the average time that Plaintiff could stand or walk at a given time and in a workday. This resulted in conclusions that Plaintiff, on average, could stand for one hour at a time and for four hours in a workday, walk for one hour at a time and for four hours in a workday, and stand and walk a combined 5 hours in a workday.[4]

On the other hand, Dr. Klein, after the initial hearing and without being called to testify at the supplemental hearing, filled out a physical RFC questionnaire that only vaguely shed light on Plaintiff's conditions. For example, the physical RFC questionnaire presented Dr. Klein with preset answers that, for the most part, provided no opportunity for meaningful elaboration. Unlike Dr. Duby, who testified at the supplemental hearing and responded to questions from the ALJ and Plaintiff's attorney, Dr. Klein was restricted in the ability to explain his answers or adequately compare Plaintiff's impairments at different times and in varying treatment settings. Dr. Klein's physical RFC questionnaire

---

[4]The Court so finds despite Dr. Duby's isolated statement about Plaintiff's inability to sit, walk, and stand during an 8-hour workday due to lower back pain. (Doc. 13-2, pgs. 41-42). The ALJ adequately explained that the objective and other evidence contained in the record, namely, the "minimal" or "very mild" abnormalities in Plaintiff's lumbar spine, did not result in more than minimal functional limitations of Plaintiff. (Doc. 13-2, pgs. 14-15). Even Dr. Duby noted, while Plaintiff's lower back pain was well documented, there was no causal diagnosis and a minimal amount of investigation. (Doc. 13-2, pg. 39).

also appeared to be based solely on his treatment of Plaintiff, while Dr. Duby's testimony at the supplemental hearing was based on a review of the entire record. As such, Dr. Klein's physical RFC questionnaire seemed to present problems of form and substance because, unlike Dr. Duby, he was not positioned to fully contextualize the impairments. Regardless, though, Dr. Klein provided neither citations nor other support from his own records or the evidentiary record as a whole. In light of this circumstance, coupled with the ALJ's detailed explanations of the cumulative evidence in this case, the ALJ could properly find Dr. Klein's physical RFC questionnaire was not supportable or consistent. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2); 416.920c(c)(1)-(2); *Smith*, 9 F. Supp. 3d at 887.

For these reasons, the Court **FINDS** the ALJ's RFC assessment, which thoroughly discussed and combed through the evidence, was based on substantial evidence and not an erroneous legal standard. *See* 42 U.S.C. § 405(g); *Clifford*, 227 F.3d at 869; *Martin*, 950 F.3d at 373; *Jarnutowski*, ---F.4th---, 2022 WL 4126293, *3. Accordingly, the Court **CONCLUDES** the ALJ's alleged failures, relating to the doctors' opinions and the RFC assessment, did not erroneously prevent a finding that Plaintiff was disabled at step 5.

<u>Conclusion</u>

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: September 30, 2022.

_____
DAVID W. DUGAN
United States District Judge